### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 1:23-CR-00044** |
| Plaintiff, | : | **JUDGE MICHAEL BARRETT** |
| v. | : | **UNITED STATES'** |
| | : | **SENTENCING MEMORANDUM** |
| | : | **REGARDING WILLIAM LINDSAY** |
| **WILLIAM LINDSAY,** | : | |
| Defendant. | : | |

The United States Attorney's Office submits this sentencing memorandum with respect to William Lindsay (a/k/a "Smith"). Lindsay pleaded guilty to Count 5 of the Indictment, which charged him with robbery of a postal carrier, in violation of 18 U.S.C. 2114. Based on the factors set forth in 18 U.S.C. § 3553(a) and the facts discussed below, the United States recommends a sentence of 48 months of imprisonment, along with a term of supervised release, and a $100 special assessment.

**I.  THE COURT'S TASK AT SENTENCING.**

After the Supreme Court's landmark decision in *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines are advisory, and judges must now impose sentences in accordance with 18 U.S.C. § 3553(a), which describes the factors to be considered. A district court must still use the Guidelines to calculate a defendant's sentencing range and consider the range when devising a sentence. *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 596 (2007).

After calculating the advisory Guidelines range, the Court must consider that range along with the 18 U.S.C. § 3553(a) factors before arriving at the final sentence. These factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--

>  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>  (B) to afford adequate deterrence to criminal conduct;
>
>  (C) to protect the public from further crimes of the defendant; and
>
>  (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) . . . the sentencing range established . . . [by the Guidelines];

(5) any pertinent policy statement . . . issued by the Sentencing Commission . . . that . . . is in effect on the day of sentencing[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

**II.     NATURE OF THE OFFENSE.**

This case is part of a wave of mail theft and bank fraud that has victimized the Greater Cincinnati area over the past two years.

### Arrow Keys and Mail Theft in General

In general, the U.S. Postal Service (USPS) uses blue collection boxes in public areas to collect outgoing mail. As a result, criminals routinely target USPS mail to steal checks for the purpose of altering them and depositing them at financial institutions. Criminals typically steal these checks from USPS blue mail collection boxes through the use of a stolen proprietary USPS key which opens these boxes, commonly referred to as an "Arrow Key." In cases where personal checks are stolen, the pen ink is often removed by criminals in a process called "washing" and then re-

2

written into the name of a person who deposits the altered check into their checking account. Persons who engage in this deposit activity are known as money mules.

Checks are commonly washed by using a chemical to wash away the pen ink used to write information on a check without damaging the check or its higher quality ink. The criminal will then add unauthorized information on the check so it can be deposited into a money mule's account. Sometimes the check's information will also be saved (either in a ledger, electronic device, or electronic storage media) to enable the creation of counterfeit checks which are printed using a computer, printer and blank check stock.

Once the check has been washed and re-written, the recruiter will co-ordinate with the mule to have the check placed into the mule's account. If the forgery is not detected by the bank and funds are credited to the mule's account, the money is then removed from the bank account via transfer, purchases, or cash withdrawals before the check's alteration is noticed, the bank alerted, and the charges reversed. Business checks are often altered in a similar manner, however sometimes the depositor will instead falsely endorse the check to his/herself without altering the checks face. Money mules and those they work for often use mobile deposits for these checks, because it is believed the computers that approve checks deposited by mobile application are less likely to detect alteration than a person. The person who recruits money mules into the schemes are referred to as recruiters.

In 2022 and 2023, the USPS has seen a sharp increase in numerous postal carriers being robbed of the arrow keys for the blue collection boxes.  Many of these robberies have occurred at gunpoint.  Others have illegally purchased arrow keys from USPS employees.  This loss of arrow keys has led to a corresponding increase in mail theft from collection boxes and check fraud.

**Mail Theft by the Defendants**

Defendant Lindsay is part of a group that has illegally obtained and used USPS arrow keys to steal U.S. mail and engage in bank fraud. The checks stolen from the mail are then washed and fraudulently cashed. This case is linked with other members of the group like Lawrence Sherman in Case No. 1:23-CR-0013.

**The Fay Apartments Key Robbery.** William Lindsay orchestrated and participated in the robbery of a USPS arrow key from a postal carrier in the Fay Apartments on March 13, 2023.

On that day, William Lindsay drove two unidentified individuals through the Fay Apartments, looking for a postal carrier. Once the victim was spotted, the two passengers exited the vehicle and walked towards the carrier. They entered one of the apartment buildings and traveled through the building to the entry foyer where the postal carrier was delivering mail. While the postal carrier was preparing to deliver mail into the building boxes, the two assailants ran down a flight of stairs and snatched the USPS arrow key from the box. Upon seeing the two men approach, the postal carrier stepped back in fear as the assailants grabbed the keys. The men then ran through the Fay Apartments to an apartment where William Lindsay was parked.

Later that day, on March 13th, Lindsay sent a telegram message to a friend that stated: "I got 🔑 now." (PSR, pars. 36-40.)

Around that same time, agents had been investigating the connection of stolen checks to a house on Daly Road. As part of the overall investigation in early 2023, agents did two trash pulls and later obtained a search warrant from a house at 8101 Daly Road. On March 15, 2023, agents executed the search warrant at the house.

The basement area had a makeshift bedroom where William Lindsay was staying. Among Lindsay's belongings in the basement, agents found the USPS vehicle ID tag that was connected to the arrow key stolen at the Fay Apartments two days earlier.



Agents also recovered USPS mail bins, ammunition, and stolen mail and checks from that address with a face value of $217,566.27.

Two important points that bear noting:

(1) The two assailants with William Lindsay have not been identified or charged; and

(2) Although the vehicle tag was recovered, the actual USPS arrow key has not been recovered, even though Lindsay indicated to others that he possessed the key. Throughout this case, Lindsay has made no effort to return the USPS arrow key.

**Lindsay's Other Check Fraud Activities**. In addition to the assault and robbery of the postal carrier, there are other incidents that show Lindsay's involvement in the stolen check scheme.

On July 27, 2022, Lindsay withdrew funds from an account that were proceeds of a stolen and washed check in the amount of $3900. Later that month, Lindsay made deposits and withdrawals related to two other stolen checks with a value of $22,100.40. On August 8, 2022, Lawrence Sherman (a defendant in a related case) made a withdrawal from an account into which a $6,300 fraudulent check had been deposited, while driving a vehicle registered to Lindsay. On August 11, 2022, Lindsay withdrew funds from an account into which Arnando Miller deposited a $4,760 fraudulent check. (PSR, par. 33.)

Despite his involvement in related check fraud, probation has determined that these offenses <u>cannot</u> be included when computing the offense level. (PSR, par. 41.) Accordingly, the offense level in this case understates Lindsay's criminal conduct.

**Post-Indictment Events and Detention**. Lindsay was granted an OR bond starting on April 28, 2023. He received a bond violation for an OVI charge on October 4, 2023. Lindsay apparently had oral surgery earlier that day and claimed that he was on a pain medication. His bond was continued. (PSR, par. 29.)

On December 12, 2023, Lindsay was shot when he stepped outside his residence. Responding officers located a large bag of marijuana on Lindsay at the time. It is suspected that there was a drug transaction at issue. Lindsay has not cooperated in the investigation and has not identified who shot him. Lindsay's bond was revoked on January 2, 2024. (PSR, par. 30.)

### III. SENTENCING GUIDELINES.

A district court must use the Sentencing Guidelines to calculate a defendant's sentencing range and consider the range when devising a sentence. *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 596 (2007).

According to the PSR, the base offense level is 20. 2 levels are added because of the post office property was the object of the offense. (PSR, pars. 48-49.) The plea agreement contemplated that an additional 3 levels would be added pursuant to Section 3A1.2(a) because the victim is a government employee. However, Probation determined that such enhancement was <u>not</u> applicable due to the nature of the base offense. Accordingly, after acceptance, the PSR calculated an offense level is 19. Despite Lindsay's numerous offenses in juvenile court, including multiple firearms charges, Lindsay has a Criminal History Category of I. As a result, the guideline range is 30-37 months.

As referenced above, this calculation understates the breadth of Lindsay's criminal conduct, does not include the related check fraud, and does not account for Lindsay's possession of the arrow key.

### IV. THE GOVERNMENT'S RECOMMENDATION.

Lindsay was the driver and the organizer of an assault on a postal carrier. It is true that the robbery did not involve a gun and the postal carrier was unharmed. However, this incident cannot be separated from the current climate where postal carriers are in constant fear of an armed robbery. Having two men rush a postal carrier in the Fay Apartments with a snatch and run robbery is still a traumatic experience for a postal carrier.

An upward variance is warranted for several reasons. First, after the robbery, Lindsay represented to others that he had the arrow key, suggesting that he was the primary organizer and beneficiary of the offense. In addition, Lindsay's coconspirators have not been identified or charged, nor has the arrow key been recovered. Accordingly, that key has remained on the street since March 2023 and is contributing to the ongoing mail theft problem. Lindsay bears the responsibility for the assault and the ongoing mail theft as a result.

In addition, since at least the middle of 2022, William Lindsay has been tied to and involved in the mail theft and check washing schemes related to Lawrence Sherman and Arnando Miller. Lindsay has personally been tied to such fraudulent withdrawals and deposits. However, this conduct is not included in the guidelines calculation, but is significant. This conduct further justifies the upward variance.

Finally, it bears noting that Lindsay is not before this Court for a single incident that was spontaneous or impulsive. Rather, his crime spree required planning and persistence. The robbery alone involved advance planning, scouting, surveillance, and then a getaway plan and transfer of the vehicle. This level of calculation reflects on the seriousness of the offense, as well as the nature and characteristics of the defendant. Given the need for deterrence and punishment related to such crimes, an upward variance is warranted.

Based on the circumstances set forth in the PSR and in this sentencing memorandum, as well as the factors in Section 3553(a), the government recommends that the Court impose a sentence of imprisonment of 48 months for defendant William Lindsay, a term of supervised release, and a $100 special assessment.

        Respectfully submitted,

        KENNETH L. PARKER
        United States Attorney

        s/Timothy S. Mangan
        TIMOTHY S. MANGAN (069287)
        Assistant United States Attorney
        221 East Fourth Street, Suite 400
        Cincinnati, Ohio 45202
        Office: (513) 684-3711
        Fax: (513) 684-6385
        E-mail: Timothy Mangan@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Memorandum was served this 27th day of March 2024, electronically upon all counsel of record.

        s/Timothy S. Mangan
        TIMOTHY S. MANGAN (069287)
        Assistant United States Attorney